1  Emma D. Enriquez (SBN 225059)
2  emma@emmaenriquez.com
   LAW OFFICES OF EMMA D. ENRIQUEZ
3  505 N. Arrowhead Avenue, Ste. 510
4  San Bernardino, CA 92401
   (909) 206-1246 (office/facsimile)
5
6  Attorneys for Defendants/Cross-Complainants,
   El Paseo Jewelry, Inc., a California corporation;
7  El Paseo Jewelry Exchange, Inc. a Nevada corporation;
8  Raju Mehta, an Individual

9
10            **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

12

13  OUT OF THE BOX ENTERPRISES, a        Case No.: EDCV10-1858 VAP(DTBx)
14  Texas limited liability company;
                                          **MOTION FOR RELIEF FROM**
15            Plaintiff,                  **JUDGMENT BASED ON NEWLY**
                                          **DISCOVERED EVIDENCE**
16  vs.                                   **AND/OR FRAUD PURSUANT TO**
                                          **FRCP RULE 60(b)(2) and (3)**
17  EL PASEO JEWELRY EXCHANGE,
18  INC., a Nevada corporation; EL
    PASEO JEWELRY, INC., a California     Hearing Date: December 16, 2013
19  corporation; RAJU MEHTA, an          Hearing Time: 2:00 p.m.
20  individual; IVAN KALENSKY, an        Courtroom: 2
    individual,
21                                        Date Judgment Entered:  October 30,
              Defendants.                 2012
22

23        TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
24        PLEASE TAKE NOTICE that on December 16, 2013 at 2:00 p.m., or as
25  soon thereafter as the Motion may be heard at the United States District Court,
26  located at 3470 Twelfth Street, Courtroom 2, Riverside, CA 92501-3801,
27  Defendants El Paseo Jewelry, Inc., a California corporation, El Paseo Jewelry
28
   ―――――――――――――――――――――――――――――――
        MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
                    FRCP RULE 60(b) - 1

1  Exchange, Inc., a Nevada corporation, and Raju Mehta (collectively "El Paseo")

2  will and hereby do move this Court for relief from the Judgment entered on

3  October 30, 2012.  This Motion is based upon this Notice of Motion, the

4  supporting Declaration of Emma D. Enriquez, the Index of Exhibits in Support of

5  El Paseo's Motion for Relief from Judgment, filed concurrently herewith, the

6  Court's file on this matter, and upon such and further evidence and argument as

7  may be presented prior to or at the time of the hearing on this Motion.

8

9  DATED:  October 29, 2013                **LAW OFFICES OF EMMA D.**
                                           **ENRIQUEZ**

10

11                                         Emma D. Enriquez
                                           Attorney for El Paseo Jewelry, Inc., a
12                                         California corporation;
13                                         El Paseo Jewelry Exchange, Inc. a Nevada
                                           corporation;
14                                         Raju Mehta, an Individual

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
FRCP RULE 60(b) - 2

# **TABLE OF CONTENTS**

I.   INTRODUCTION .......................................................................... 3

II.  STATEMENT OF THE CASE AND RELEVANT FACTS ................ 4

   1.   "Spot Price" v. "We Buy the Most" Campaigns .............................. 5

   2.   OOTB Produced Trial Exhibit 98 in Support of its Damages.......... 6

   3.   There are Three Different Versions of OOTB Gold Purchases ....... 6

      i.    Comparison of Volume Ads with Trial Ex. 98 ..................... 6

      ii.  Comparison of Trial Ex. 98 with Check Ledgers .................. 8

   4.   Evidence that OOTB Adjusted/Manipulated Gold Purchases ......... 9

   5.   Evidence Shows Cash Purchases Are Missing from Exhibit 98 .... 10

   6.   EL PASEO'S DISCOVERY OF THE AD DISCREPANCY ....... 10

III. APPLICABLE LAW....................................................................... 11

IV.  THE REQUIREMENTS OF RULE 60(b)(2) ARE MET.................. 12

V.   THE REQUIREMENTS OF RULE 60(b)(3) ARE MET .................. 15

VI.  OTHER CONSIDERATIONS OF RULE 60(b) ARE MET ............. 15

VII. THIS MOTION IS TIMELY ............................................................ 16

VIII. CONCLUSION ............................................................................. 16

# TABLE OF AUTHORITIES

**Statutes**

Fed. R. Civ. P. Rule 60(b)(2) ....................................................... 11

Fed. R. Civ. P. 60(b)(3)............................................................... 12

**Cases**

*Adler v. Fed. Republic of Nigeria*, 219 F. 3d 869 (9th Cir. 2000) ................ 3

*Ames Publ'g Co. v. Walker-Davis Publ'ns, Inc.*, 372 F. Supp. 1, 13-15

       (E.D. Pa. 1974).................................................................. 14

*Compass Tech v. Tseng Lab*, 71 F.3d 1125, 1130 (3d Cir. Pa. 1995)........ 12

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985)........... 13

*FLIR Sys. v. Sierra Media, Inc.*, 2013 U.S. Dist. LEXIS 111833, 16-17

       (D. Or. Aug. 8, 2013) ......................................................... 3

*Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 849

       (W.D. Tex. 2001). .............................................................. 14

*Lenz v. Universal Music Corp.*, 2010 U.S. Dist. LEXIS 16899,

       (N.D. Cal. 2010).................................................................. 14

*Rucci v United States INS* 405 F3d 45 (2005, CA1 Puerto Rico) ............. 12

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*,

       621 F.3d 981, 986 (9th Cir. 2010)....................................... 13

*U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1254 (D. Ariz. 1981),

       aff'd, 681 F.2d 1159 (9th Cir. 1982)............................................. 14

# I.   INTRODUCTION

El Paseo respectfully moves this Court for an order relieving El Paseo from the Judgment entered against it on October 30, 2012, on two grounds.

First, new evidence shows that plaintiff Out of the Box Enterprises ("OOTB") falsely advertised the volume of gold purchases that it made during the relevant period of advertising.  This new evidence, consisting of OOTB's volume advertising ("Volume Ads"), is material and is not merely cumulative because it was never presented at trial.  The Volume Ads could not have been discovered before trial through the exercise of reasonably diligence, because OOTB manipulated its financial data throughout discovery and trial.  If El Paseo had been able to present the Volume Ads at trial, it probably would have changed the outcome of the trial because, the Volume Ads, along with OOTB's financial records, would have been the basis of an affirmative defense of unclean hands.  Unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *FLIR Sys. v. Sierra Media, Inc.*, 2013 U.S. Dist. LEXIS 111833, 16-17 (D. Or. Aug. 8, 2013) (quoting *Adler v. Fed. Republic of Nigeria*, 219 F. 3d 869 (9th Cir. 2000).  Thus, El Paseo is entitled to relief from the Judgment under FRCP 60(b)(2).

Second, OOTB submitted false financial information, as Trial Exhibit 98 ("Exhibit 98") in order to obtain its Judgment.  OOTB's damages expert, David Nolte ("Nolte"), materially relied upon Exhibit 98 to render his opinion that OOTB lost $4,950,000 in gold purchases during the Advertising Period.  During Nolte's testimony, OOTB published to the Court and jury at least two charts (as demonstrative evidence) allegedly showing OOTB's actual gold purchases.  The charts were based on Exhibit 98.  The following evidences that Exhibit 98 is false:

- Exhibit 98 is contradicted by OOTB's check ledgers that show actual checks written to OOTB customers for gold purchases ("Check Ledgers").
- Exhibit 98 is the product of adjustments applied by OOTB to its financial records during the historical period of time in which OOTB asked the Court and jury to consider its "lost profits".   These adjustments, consisting of various additions and subtractions to the Check Ledgers, cumulatively result in OOTB eliminating over $1.1M from its actual gold purchases made by check.
- Exhibit 98 does not include any cash gold purchases.  At trial, OOTB's principal, Darin Damme ("Damme") testified that OOTB paid cash for gold purchases but did not reflect these in its financial statements.

Based on the evidence of false financial information, El Paseo is entitled to relief from the Judgment under FRCP 60(b)(3).  To the extent necessary, El Paseo asks the Court to schedule an evidentiary hearing and the ability to subpoena the following:  (1) the person most knowledgeable for the Desert Sun newspaper (testify as to the Volume Ads Exhibits and the parties advertisements during the relevant periods); and (2) the person most knowledgeable from the Riverside County Police Department (produce and testify as to purchase information OOTB provided to the Department – these records compared with Trial Exhibit 98 may disclose amount of cash transactions not included in Trial Exhibit 98).

El Paseo has brought this Motion within one year of the entry of Judgment, October 30, 2012.  For purposes of FRCP 60(b)(2) and (3), the Motion is timely.

## II.    STATEMENT OF THE CASE AND RELEVANT FACTS

From 2009 to 2012, El Paseo and OOTB were competitors in the gold purchasing industry in the Coachella Valley.

1

### 1.   "Spot Price" v. "We Buy the Most" Campaigns

2      From January, 2010, to September, 2010, El Paseo and OOTB both ran ads

3   in the Desert Sun while competing for the same Coachella Valley audience

4   ("Advertising Period"). (Ex. 1, TT (Day 2) (Damme), p. 56 "El Paseo Jewelry was

5   my competitor.") Both campaign ads were based on the premise that the

6   companies paid consumers the highest prices for their gold in the Coachella

7   Valley. (Ex. 1, TT (Day 2) (Damme), p. 33.) El Paseo's campaign focused on

8   payment of up to "92%" of the spot price of gold. (Ex. 1, TT (Day 6) (Damme), p.

9   31.)

10      OOTB's campaign was based on the slogan, "We buy the most. We pay the

11   most." (Ex. 1, TT (Day 2) (Damme), p. 33.) OOTB's Volume Ads, pitted directly

12   against El Paseo's Ads, boldly declared that OOTB had purchased between

13   $2,600,000 to $8,300,000 in gold from the Coachella Valley during the

14   Advertising Period. (Ex. 1, (Day 2) (Damme), p. 33 [from 9/09 to early 2010, "I

15   believe we ran an ad almost every day in the Desert Sun . . .].) On December 2,

16   2010, Out of the Box filed the present Action based on its claims that El Paseo's

17   Spot Gold Campaign was false and that it lost, approximately $5,000,000 in gold

18   purchases during the period of time in which El Paseo ran the Spot Gold

19   Campaign. (Ex. 3, TT (Day 8) (Nolte), p. 42.)

### 2.   OOTB Produced Trial Exhibit 98 in Support of its Damages

20      To support OOTB's claim that it lost approximately $5,000,000 in gold

21   purchases due to El Paseo's campaign, OOTB presented Trial Exhibit 98 and the

22   testimony of David Nolte, CPA, of Fulcrum Financial Inquiry, LLP ("Nolte").

23   (Ex. 3, TT (Day 8) (Nolte), p. 31, 32-34; Exs. 19-25.) In support of his opinion

24   that OOTB had lost $5,000,000 in gold purchases and profits of $2,277,000, Nolte

25   testified that he relied on Trial Exhibit 98. (Id.) Nolte also plotted the gold

26   purchase information contained within Trial Exhibit 98 on demonstrative graphs

27   marked as Exhibit 286. (Id.) Exhibit 286 was published for the jury to look at

28

while Nolte testified.  It is El Paseo's understanding that Exhibit 286 contained the same numbers as listed in Nolte's report, dated October 21, 2011.  (See Ex. 25.)  The purchase sales information listed on Nolte's report (see exhibits to Ex. 25) show that Nolte took information from financial information identical to Trial Exhibit 98.  As detailed further below, Trial Exhibit 98 is the product of manipulations that artificially decreased OOTB's reported gold purchases.

### 3. <u>There are Three Different Versions of OOTB Volume of Gold Purchases</u>

The best way to illustrate this is to compare evidence from three different sources of information:

1. <u>Volume of OOTB Gold Purchases as advertised by OOTB During the Advertising Period ("Volume Ads")</u>:  OOTB's Volume Ads are attached as to the Index of Exhibits as Exhibits 4-18.   They are also summarized in a chart attached to this Motion as Exhibit "A".

2. <u>Volume of OOTB Gold Purchases Per Exhibit 98 ("Exhibit 98 Purchases")</u>:  Trial Exhibit 98 ("Exhibit 98") is attached to the Index of Exhibits as Exhibits 14-25.   The information is summarized in a chart attached to this Motion as Exhibit "B".

3. Volume of OOTB Gold Purchases Per OOTB's Check Ledgers ("Check Ledger Purchases"):  The Check Ledgers are attached to the Index of Exhibits as Exhibits 27-42.   The information is summarized in a chart attached to this Motion as Exhibit "C".

**(a) COMPARISON OF VOLUME ADVERTISING WITH TRIAL EXHIBIT 98**

The first comparison, illustrates the differences between (a) OOTB's volume of gold purchases as represented to the public in its Volume Ads from October 1, 2009, through April 30, 2010, on the one hand; and (b) OOTB's volume of gold purchases as represented in Trial Exhibit 98, on the other hand.  This particular period of time for comparison was selected for the following reasons:

  o   The information is the clearest for this period of time.

- o The information is anchored with (1) OOTB's October 6 2009 (Ex. 6), ad on the one end, and (2) OOTB's (a) May 3, 2010, Volume Ad (Ex. 12); and (b) May 6, 2010 Article on the other (Ex. 13, Desert Sun article "Seller Beware When Cashing in on Gold".)
- o The timeframe begins with the first full month of OOTB's brick-and-mortar store and runs through the first four months of the Advertising Period.
- o The information in Column "A" is taken from the "Volume Advertised" Column in Exhibit "A" attached to this Motion.
- o The information in Column "B" is taken from the "Customer Gold Purchases" Column in Exhibit "B" attached to this Motion.

| MONTH | ADVERTISED VOLUME INCREASE (A) | EX. 98 VOLUME INCREASE (B) | DIFFERENCE |
|---|---|---|---|
| Oct., 2009 | $1,300,000 | $515,832 | ($784,168) |
| Nov., 2009 | $1,000,000 | $715,519 | ($284,481) |
| Dec., 2009 | $800,000 | $669,818 | ($130,182) |
| Jan., 2010 | $1,200,000 | $615,684 | ($110,793) |
| Feb., 2010 | 0 | $473,523 | (included above) |
| March, 2010 | $1,800,000 | $152,559 | ($1,230,981) |
| April, 2010 | 0 | $416,460 | (included above) |
| Totals: | $6,100,000.00 | $3,559,395.00 | ($2,540,605.00) |

**CONCLUSION: OOTB either (1) inflated gold purchases to the public by over $2.5M during this period; OR (2) falsely decreased gold purchases to the Court and jury.**

*/ / /*

*/ / /*

*/ / /*

MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
FRCP RULE 60(b) - 7

### (b)   COMPARISON OF EXHIBIT 98 WITH CHECK LEDGERS

The historical period of time as referenced by OOTB in Exhibit 98 and its demonstrative evidence published to the Court and jury is listed.  This period begins with September, 2009, and runs through December, 2010.

- o   The information in Column "B" is taken from the "Customer Gold Purchases" Column in Exhibit "B" attached to this Motion.
- o   The information in Column "C" is taken from the "Gold Purchases by Check" Column in Exhibit "C" attached to this Motion.

| MONTH | EX. 98 (B) | CHECK LEDGERS (C) | DIFFERENCE[1] |
|-------|-----------|-------------------|---------------|
| Sept., 2009 | $47,915 | $172,915 | ($124,990) |
| Oct., 2009 | $515,832 | $495,832 | |
| Nov., 2009 | $715,519 | $894,389 | ($178,870) |
| Dec., 2009 | $669,818 | $1,021,867 | ($352,049) |
| Jan., 2010 | $615,684 | $445,684 | |
| Feb., 2010 | $473,523 | $448,523 | |
| March, 2010 | $152,559 | $362,559 | ($210,000) |
| April, 2010 | $416,460 | $274,081 | |
| May, 2010 | $437,629 | $437,086 | |
| June, 2010 | $329,429 | $655,206 | ($325,777) |
| July, 2010 | $411,726 | $415,256 | |
| Aug., 2010 | $172,158 | $387,165 | ($215,007) |
| Sept., 2010 | $405,302 | $467,706 | ($62,404) |
| Oct., 2010 | $532,658 | $583,702 | ($51,044) |

---

[1]   Note: Only the negative differences between Exhibit 98 and the Check Ledgers (subtractions to the Check Ledgers) are reflected in this column.   OOTB did make additions to Check Ledgers during some of the months. The cumulative effect of the adjustments (both positive and negative) result in approximately $1.2M in reductions to the Check Ledgers as illustrated in the section below.

| Nov., 2010 | $532,658 | $445,569 | |
| Dec., 2010 | $490,335 | $619,665 | ($129,330) |
| **Totals:** | $6,919,205.00 | $8,127,205.00 | |

**CONCLUSION:  OOTB falsely decreased gold purchases during Historical Period in order to obtain its judgment.**

### 4. Evidence that OOTB Adjusted/Manipulated Gold Purchases (by Check) in the Financials in Order to Reduce its Volume Purchase Information at Trial

A review of the adjustments OOTB made to its Check Ledgers over the Historical Period shows that OOTB manipulated its volume purchases numbers, resulting the elimination of almost $1.2M in its purchases ("adjusted numbers" ultimately reflected on Exhibit 98).

| MONTH | SUBTRACTIONS TO CHECK LEDGER (A) | ADDITIONS TO CHECK LEDGER (B) |
| --- | --- | --- |
| Sept., 2009 | ($125,000) | 0 |
| Oct., 2009 | 0 | $20,000 |
| Nov., 2009 | ($178,870) | 0 |
| Dec., 2009 | ($352,049) | 0 |
| Jan., 2010 | 0 | $170,000 |
| Feb., 2010 | 0 | $25,000 |
| March, 2010 | ($210,000) | 0 |
| April, 2010 | 0 | $142,379 |
| May, 2010 | 0 | $543 |
| June, 2010 | ($113,396) | 0 |
| July, 2010 | ($85,827) | 0 |
| Aug., 2010 | 0 | $24,604 |
| Sept., 2010 | ($295,548) | 0 |
| Oct., 2010 | ($178,400) | 0 |

| Nov., 2010 | 0 | $87,089 |
| Dec., 2010 | ($129,330) | 0 |
| **Totals:** | ($1,668,420.00) | $469,615.00 |

**CONCLUSION: OOTB's adjustments resulted in almost $1.2M in reductions to OOTB's gold purchases as reflected in its Check Ledgers.**

### 5.   Evidence Shows that Cash Purchases Are Missing from Exhibit 98

At trial, OOTB testified (through Darin Damme) that it made cash purchases during the Historical Period.

> "If you went back and counted our invoices, these are our Quickbook purchases, absolutely.  But if you were to calculate our invoices, there were many people who were also paid in cash.  And so the money taken out would be a withdrawal from the bank and that would be one transaction, and then eventually, the money would be put back in, and that would be another transaction.  But in the meantime, there would be multiple individual transactions that would be shown on our invoices, and that would be the most accurate way to do that."
> (Damme, TT, Day 9, p.183:13-21.) (Ex. 1.)

Yet, no cash purchases are reflected on Exhibit 98.  This is evident given: (1) the fact that no cash purchases are reflected in the Check Ledgers; and (2) the Check Ledgers were adjusted to arrive at the "Customer Gold Purchases" listed on Exhibit 98 (eliminating any likelihood that positive adjustments reflect cash transactions – because the negative adjustments outweigh the positive by almost $1.2M).

### 6.   EL PASEO'S DISCOVERY OF THE ADVERTISING DISCREPANCY

The manner in which OOTB disclosed its financial information made it so that El Paseo could not reasonably have discovered the discrepancies between the Volume Ads and OOTB's financial statements before the trial.  One of the most

significant facts in support of this is that Nolte did not testify as to OOTB's financials or the basis of his opinion until Day 8 - Phase II (damages phase of the trial). (Ex. 3, TT (Day 8) (Nolte), p. 31, 32-34; Exs. 19-25.)  Up to this point in time, OOTB's assertion as to its gold purchases finances had been in a state of near-constant fluctuation. (For a harrowing attempt at following the numbers, see (1) Ex. 25 and exhibits attached thereto, Nolte's first report wherein he states certain amounts for OOTB's gold purchases; compare with (2) Exs. 26-42, printed copies of OOTB's Check Ledgers that (a) provide running totals of monthly gold purchases paid for by check that differ from Ex. 25 gold purchase numbers, and that (b) indicate that "adjustments" were primarily made to the Quickbook accounts by OOTB at the end of the month; compare with (3) Ex. 26 consisting of an audit trail of the Quickbooks that show that most of the adjustments were actually made on or about September 23, 2011 – the date that OOTB produced Quickbooks records to El Paseo; then compare (4) with Ex. 43, Nolte's "supplemental report", dated July 5, 2012 [eve of trial] in which Nolte's list of OOTB's gold purchases differ from Nolte's first report, Ex. 25; and then yet, compare with Ex. 3, TT (Day 8) (Nolte), p. 31, 32-34, wherein Nolte states that Trial Exhibit 98 lists OOTB's gold purchases [Exhibit 98 gold purchases differ from Exhibits 25 and 43.)  Given the constant change to OOTB's financial, El Paseo could not have reasonably been expected to compare the financials provided on Day 8 of the trial with OOTB's Volume Ads prior to the trial.

### III.   APPLICABLE LAW

FOR NEWLY DISCOVERED EVIDENCE:

> "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b). . ." Fed. R. Civ. P. Rule 60(b)(2).

The due diligence standard requires that new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence, (3) would probably have changed the outcome of the trial." *Compass Tech v. Tseng Lab*, 71 F.3d 1125, 1130 (3d Cir. Pa. 1995).

FOR FRAUD:

> "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . (3) "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3).

OTHER CONSIDERATIONS:

Fed. R. Civ. P. 60(b) relief is extraordinary in nature and to warrant such relief movant must demonstrate that: (1) motion is timely, (2) exceptional circumstances justify granting extraordinary relief, and (3) vacating judgment will not cause unfair prejudice to opposing party; (4) moreover, district court should only grant Rule 60(b) relief if moving party demonstrates that underlying claims have reasonable chance of success on merits. *Rucci v United States INS* 405 F3d 45 (2005, CA1 Puerto Rico). "In order to prevail on a Rule 60(b)(2) motion, a movant must demonstrate . . . that the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment." *Id.*

## IV.   THE REQUIREMENTS OF RULE 60(b)(2) ARE MET

The Volume Ads are not cumulative because they were not part of the Action. The Volume Ads could not have been discovered before trial through exercise of reasonable diligence because Nolte did not testify as to OOTB's financials or the basis of his opinion until Day 8 - Phase II (damages phase of the trial). (Ex. 3, TT (Day 8) (Nolte), p. 31, 32-34; Exs. 19-25.) Up to this point in time, OOTB's assertion as to its gold purchases finances had been in a state of near-constant fluctuation. (See early discussion.)

Additionally, the Volume Ads would have probably changed the outcome of the trial because unclean hands is an affirmative defense, and, under facts similar to the present Action, a complete bar to a Lanham Act false advertising claim. A recent 9th Circuit district court case is directly on point, *FLIR v. Sierra Media, Inc.*, 2013 U.S. Dist. LEXIX 111833 (D. Or. Aug. 8, 2013). In *FLIR*, two competing camera manufacturers, "FLIR" (plaintiff/cross-defendant") and "FLUK" (defendant/cross-complainant") published advertisements as to the ability of the cameras to withstand drops without shattering. *Id.* The advertisements pertained to the same product and ran at the same time. During trial, FLIR admitted that it had published its ads before it had completed its testing on the cameras. After testing, it became evident that its ads were false. FLIR, nevertheless, pursued its action against FLUK. The jury made a factual determination, based on the preponderance of the evidence standard, that FLIR had engaged in false advertising. After judgment was entered, FLUK sought to have FLIR's damages award eliminated because it had engaged in false advertising during the period of time in which it sought damages from FLUK. As part of its analysis, the Court determined that if the evidence showed, in a clear and convincing manner, that FLIR had engaged false advertising, than the equitable doctrine of unclean hands would preclude FLIR from an award of damages. *FLIR, supra*, at 16-17 ("The doctrine 'bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted.' *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010) (internal quotation and citation omitted); see also *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (stating that 'what is material is not that the plaintiff's hands are dirty, but that . . . the manner of dirtying renders inequitable the assertion of such rights against the defendants.') The Court then took the jury's determination (based on the preponderance of the

evidence), evaluated the evidence applying the clear and convincing standard, and determined that FLIR had, indeed, engaged in false advertising.  The Court then applied the doctrine of unclean hands and removed the damages awarded to FLIR from the Judgment.   The Court further determined that FLIR, nonetheless, was entitled to injunctive relief from false advertising by FLUK.  *FLIR, supra*, at 17-18 ("In order to prevail on an unclean hands defense, 'the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'. . . The defense should only be applied 'where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.' *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1254 (D. Ariz. 1981), aff'd, 681 F.2d 1159 (9th Cir. 1982) (citing *Ames Publ'g Co. v. Walker-Davis Publ'ns, Inc.*, 372 F. Supp. 1, 13-15 (E.D. Pa. 1974)). In an action for false advertising, the unclean hands of the plaintiff must relate to the same type of product the defendant allegedly falsely advertised. *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 849 (W.D. Tex. 2001). '[W]hile the Ninth Circuit has recognized that the extent of the harm caused by the plaintiff's misconduct is a highly relevant consideration, it has not held that a defendant asserting an unclean hands defense is required to demonstrate prejudice.' *Lenz v. Universal Music Corp.*, No. C 07-3783 JF, 2010 U.S. Dist. LEXIS 16899, 2010 WL 702466 *7 (N.D. Cal. 2010) (internal quotation marks omitted) (emphasis added)".)

The evidence clearly shows that OOTB's "We Buy the Most so We Pay The Most" advertising (1) relates to the same service (buying gold) as to what it complained about and obtained the Judgment on; and (2) took place at the same time that El Paseo's "Spot Gold" advertising was taking place. El Paseo, therefore, has clear and convincing evidence that Out of the Box pursued this Action with unclean hands.

/ / /

## V. THE REQUIREMENTS OF RULE 60(b)(3) ARE MET

As set forth above, the evidence clearly shows that OOTB submitted false financial reports on which its expert, Nolte relied upon to render his opinion of damages.

To the extent necessary, El Paseo asks the Court to schedule an evidentiary hearing and for the ability to subpoena the following: (1) the person most knowledgeable for the Desert Sun newspaper (testify as to the Volume Ads Exhibits and the parties advertisements during the relevant periods); and (2) the person most knowledgeable from the Riverside County Police Department (produce and testify as to purchase information OOTB provided to the Department – these records compared with Trial Exhibit 98 may disclose amount of cash transactions not included in Trial Exhibit 98).

## VI. OTHER CONSIDERATIONS OF RULE 60(b) ARE MET

*There are exceptional circumstances here because El Paseo has more than a reasonable chance of successfully defending its position if it if fully allowed to present evidence of false advertising and/or fraudulent financial information.*

There is no unfair prejudice to OOTB. Out of the Box will, no doubt, argue that it will suffer unfair prejudice if relief from the Judgment is granted. Such relief is harmful to Out of the Box's desires to fully extinguish any and all possible competition from El Paseo. The judgment is Out of the Box's primary tool towards this goal. However, given the Advertising Discrepancy evidence, it would be unfairly prejudicial to *El Paseo* not to allow a full consideration of all of the merits of this case. On the other hand, Out of the Box will not have suffered *any unfair prejudice* if it is determined that it falsely advertised its volume during the Advertising Period and/or presented false financial information. In short, the scales tip heavily favor of El Paseo's interests as opposed to Out of the Box's interests in considering this Motion.

/ / /

## VII.   THIS MOTION IS TIMELY

Judgment was entered on October 30, 2012.  El Paseo has filed this Motion within "no more than a year after the entry of the judgment or order or date of the proceeding."  Fed. Rule Civ. P. Rule 60(c).

## VIII. CONCLUSION

Based on the foregoing, the Court should grant El Paseo relief from the Judgment entered on October 30, 2012.  OOTB's Advertising Discrepancy shows that OOTB either (1) engaged in false advertising during the Advertising Period and is, therefore, not entitled to the Judgment because it came into the Action with unclean hands; OR (2) obtained the Judgment with false financial information.  To the extent necessary, El Paseo asks the Court to schedule an evidentiary hearing.

Respectfully submitted,

DATED:  October 29, 2013        **LAW OFFICES OF EMMA D. ENRIQUEZ**

Emma D. Enriquez
Attorney for El Paseo Jewelry, Inc., a
California corporation;
El Paseo Jewelry Exchange, Inc. a Nevada
corporation;
Raju Mehta, an Individual

**EXHIBIT A to MOTION FOR RELIEF FROM JUDGMENT**

## EXHIBIT A

## VOLUME OF GOLD PURCHASES AS ADVERTISED

The following is a summary of information as presented on Exhibits 4-18 on the Index of Exhibits.  The columns, "Volume Period" and "Volume Advertised" contain information inferred from the dates and representations made by OOTB to the public in its Volume Ads published in the Desert Sun from 2009 – 2010.

| AD DATE | VOLUME PERIOD | VOLUME ADVERTISED | INCREASE IN VOLUME ADVERTISED FROM PRIOR VOLUME AD |
|---------|---------------|-------------------|----------------------------------------------------|
| 6/5/09 | Volume from 12/08 – 5/31/09 | $1,100,000 | |
| 8/1/09 | Volume from 12/08 (as previously advertised) PLUS 6/1/09 – 7/31/09 | $1,300,000 | $200,000 |
| 10/6/09 | Volume from 12/08 (as previously advertised) PLUS 8/1/09 – 9/30/09 | $2,600,000 | $1,300,000 |
| 11/5/09 | Volume from 12/08 (as previously advertised) PLUS 10/1/09 – 10/31/09 | $3,300,000 | $1,300,000 |

| | | | |
|---|---|---|---|
| 12/5/09 | Volume from 12/08 (as previously advertised) PLUS 11/1/09 – 11/30/09 | $4,300,000 | $1,000,000 |
| 12/24/09 | Volume from 12/08 (as previously advertised) PLUS 12/1/09 – 12/24/09 | $5,100,000 | $800,000 |
| 3/8/10 | Volume from 12/08 (as previously advertised) PLUS 12/24/09 – 3/7/10 | $6,300,000 | $1,200,000 |
| 4/18/10 | Volume from 12/08 (as previously advertised) PLUS 3/8/10 to 4/17/10 | $8,100,000 | $1,800,000 |
| 5/3/10 | Volume from 12/08 (as previously advertised) PLUS 4/18/10 to 4/30/10 | $8,100,00 | (no change) |
| 5/6/10 (article) | Desert Sun Interview in Which Darin Damme states | About $8,000,000 | (no change) |

|  | that from December, 2008, to the date of the article, OOTB purchased over $8,000,000 in the Coachella Valley |  |  |
|---|---|---|---|
| 6/6/10 | Volume from 12/08 (as previously advertised) PLUS 5/1/10 – 5/30/10 | $8,300,000 | $200,000 (increase in volume advertised from April ad) |
| 7/6/10 | Volume from 12/08 (as previously advertised) PLUS June, 2010 | $8,300,000 | (no change) |
| 8/8/10 | Volume from 12/08 (as previously advertised) PLUS July, 2010 | $8,300,000 | (no change) |
| 9/6/10 | Volume from 12/08 (as previously advertised) PLUS August, 2010 | $8,300,000 | (no change) |
| 10/6/10 | Volume from 12/08 (as previously advertised) PLUS September, 2010 | $8,300,000 | (no change) |

**EXHIBIT B to MOTION FOR RELIEF FROM JUDGMENT**

**EXHIBIT B**

**VOLUME OF GOLD PURCHASES ACCORDING TO EXHIBIT 98**

The following is a summary of information as presented on Exhibits 4-25 on the Index of Exhibits.  The column "Customer Gold Purchases" are taken directly from the corresponding line on Trial Exhibit 98.

| Month | Customer Gold Purchases |
|---|---|
| Sept., 2009 | $47,915 |
| Oct., 2009 | $515,832 |
| Nov., 2009 | $715,519 |
| Dec., 2009 | $669,818 |
| Jan., 2010 | $615,684 |
| Feb., 2010 | $473,523 |
| March, 2010 | $152,559 |
| April, 2010 | $416,460 |
| May, 2010 | $437,629 |
| June, 2010 | $329,429 |
| July, 2010 | $411,726 |
| Aug., 2010 | $172,158 |
| Sept., 2010 | $405,302 |
| Oct., 2010 | $532,658 |
| Nov., 2010 | $532,658 |
| Dec., 2010 | $490,335 |
|  | Total:  $6,919,205.00 |

**EXHIBIT C to MOTION FOR RELIEF FROM JUDGMENT**

## EXHIBIT C

## VOLUME OF GOLD PURCHASES ACCORDING TO CHECK LEDGERS

The following is a summary of information as presented on Exhibits 27-42 on the Index of Exhibits.  The column, "Gold Purchases by Check" are taken directly from the running total of the check purchases (before OOTB's adjustments).

| Month | Gold Purchases by Check |
|---|---|
| Sept., 2009 | $172,915 |
| Oct., 2009 | $495,832 |
| Nov., 2009 | $894,389 |
| Dec., 2009 | $1,021,867 |
| Jan., 2010 | $445,684 |
| Feb., 2010 | $448,523 |
| March, 2010 | $362,559 |
| April, 2010 | $274,081 |
| May, 2010 | $437,086 |
| June, 2010 | $655,206 |
| July, 2010 | $415,256 |
| Aug., 2010 | $387,165 |
| Sept., 2010 | $467,706 |
| Oct., 2010 | $583,702 |
| Nov., 2010 | $445,569 |
| Dec., 2010 | $619,665 |
|  | Total:  $8,127,205.00 |